☐ **LEGIBLE SCAN**
(CHECK ONE)

☐ **ARCHIVE THIS
PAPER DOCUMENT**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JO ANN MATTHIAS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 12-1203-LPS |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

Jo Ann Matthias, Georgetown, Delaware, Pro Se Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney and Heather Benderson, Esquire, Special Assistant United States Attorney, of the Office of the United States Attorney, Wilmington, Delaware.

Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III and Evelyn Rose Marie Protano, Esquire, Assistant Regional Counsel, of the Social Security Administration, Philadelphia, Pennsylvania.

## **MEMORANDUM OPINION**

March 13, 2015
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I. INTRODUCTION

Plaintiff Jo Ann Matthias ("Matthias" or "Plaintiff") appeals from the decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security ("Commissioner" or "Defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).[1] Presently pending before the Court are cross-motions for summary judgment filed by Matthias and the Commissioner. (D.I. 26, 27) For the reasons set forth below, the Court will deny Plaintiff's motion and will grant Defendant's motion.

## II. BACKGROUND

### A. Procedural History

Matthias filed her application for DIB on July 7, 2010, alleging disability beginning November 6, 2008. The application was denied in October 2010, and upon reconsideration on March 14, 2011. Matthias filed a request for hearing on March 22, 2011. On July 11, 2011, a hearing was held before an Administrative Law Judge ("ALJ") who issued a decision finding that Matthias was not disabled under the Act. Matthias filed a request for review by the Appeals Council, which was denied on August 15, 2012 and the ALJ's decision became the final decision of the Commissioner. (D.I. 21 ("Tr.") at 1-5)

On September 25, 2012, Matthias filed a Complaint seeking judicial review of the ALJ's July

---

[1] Under § 405(g), "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . ." 42 U.S.C. § 405(g).

1

21, 2011 decision. (D.I. 2) Matthias moved for summary judgment on October 1, 2014 (D.I. 26), and the Commissioner filed a cross-motion for summary judgment on October 30, 2014 (D.I. 27).

## B. Medical and Mental Health Evidence

Plaintiff was admitted to Atlantic General Hospital in Berlin, Maryland, on September 15, 2008 with bilateral leg weakness and complaints that she could not walk. (Tr. at 202) She was hospitalized for four days. Upon admission, Plaintiff could not lift her legs off the examination table, and she was unable to ambulate or sustain her weight. (*Id.*) Plaintiff had pain with movement, and stated that the pain was almost non-existent at rest. (*Id.*) As of September 19, 2008, Plaintiff complained of significant leg weakness as well as pain and weakness in her arms which seemed to gradually progress and then suddenly worsen. (*Id.* at 198) Impression was a "suspicion of Guillain-Barré or other muscular motor neuron problems." (*Id.* at 205)

While hospitalized, Plaintiff underwent a number of studies, including a CT scan, MRIs, and an MRA. (*Id.* at 198, 208-10, 211, 212, 214, 220) The brain CT scan and the MRI and MRA of the brain were normal. (*Id.* at 198, 211, 214-15, 220) The MRI of the thoracic revealed no thoracic disc herniation or significant central canal or foraminal narrowing; the MRI of the lumbar spine revealed a mild central canal narrowing at the L4-L5 level caused by diffuse disc bulge and facet joint hypertropic change, with mild disc bulges seen elsewhere; and the MRI of the cervical spine revealed a disc bulge at the C5-C6 level. (*Id.* at 208-10, 212, 220) Other tests were ordered, but at discharge the results were pending.[2] (*Id.* at 198-99)

---

[2] The tests included blood work for heavy metals, serum Lyme antibody, SPEP, UPEP, ANCA, ANA, acetylcholine receptor, campylobacter antibody and oligoclonal bands. (*Id.* at 198-99) Dr. Peric-Stepcic reviewed the results of the testing, noting that all were "within normal range." (*Id.* at 239)

2

While hospitalized, Plaintiff improved significantly. Her leg pain resolved and leg weakness significantly improved. (*Id.* at 199) Upon discharge, she could ambulate on her own and was steady. (*Id.*) Plaintiff's discharge diagnoses included acute peripheral neuropathy[3] which improved, and "possibly Guillain-Barré but other workup still pending," vitamin B12 deficiency, lumbar disc bulges and a cervical disc bulge, history of idiopathic thrombocytopenic purpura,[4] hypomagnesemia, history of anemia but now stable CBC, and history of gastric by-pass. (*Id.* at 200).

Joseph Karnish, D.O. ("Dr. Karnish") has been Plaintiff's primary care physician for more than 15 years. (*Id.* at 303) Plaintiff saw Dr. Karnish on September 29, 2008 for "ascending paralysis, possibly Guillain-Barré syndrome." (*Id.* at 245) He noted the extensive hospital work-up, and that Plaintiff indicated she continued to note diffuse weakness. (*Id.* at 256) Plaintiff's strength was 4/5, and she was able to arise independently from the exam room chair. (*Id.*) The etiology for her myalgia and weakness was unclear. (*Id.*)

Plaintiff was seen by neurologist Dr. Gordana Peric-Stepcic ("Dr. Peric-Stepcic") on two separate occasions, September 30, 2008 and October 14, 2008.[5] On September 30, 2008, Dr. Peric-

---

[3] A condition that develops as a result of damage to the peripheral nervous system — the vast communications network that transmits information between the central nervous system (the brain and spinal cord) and every other part of the body. (Neuropathy means nerve disease or damage.) Symptoms can range from numbness or tingling, to pricking sensations (paresthesia), or muscle weakness. In acute neuropathies, symptoms appear suddenly, progress rapidly, and resolve slowly as damaged nerves heal. *See* http://ninds.nih.gov/disorders/periheralneuropathy/detail_peripheralneuropathy.htm#271663208 (Mar. 5, 2015).

[4] A bleeding disorder in which the immune system destroys platelets, which are necessary for normal blood clotting. Persons with the disease have too few platelets in the blood. *See* http://www.nlm.nih.gov/medlineplus/ency/article 000535.htm (Mar. 4, 2015).

[5] The dates of service of one visit are not clear. Dr. Peric-Stepcic either saw Plaintiff on September 30, 2008 or January 3, 2009. Dr. Peric-Stepcic's report, dated January 3, 2009, provides a date of service of September 30, 2008 in the caption of the report, but refers to a January 3, 2009 consultation and the report was electronically signed on January 3, 2009. However, the report refers

3

Stepcic noted that Plaintiff continued to have numbness in both feet with leg weakness. (*Id.* at 236) She walked slowly without support on broader base and was unable to tolerate prolonged standing or walking. (*Id.* at 236, 238) Dr. Peric-Stepcic noted 4/5 proximal leg muscle strength with decreased toe movements, and 4+/5 feet dorsiflexion. (*Id.* at 238) Dr. Peric-Stepcic noted that Plaintiff's systems were improving, and that they "could be due to Guillain-Barré syndrome which improved spontaneously," although other neuropathies were possible. (*Id.* at 239) Dr. Peric-Stepcic found that Plaintiff's muscle strength and hypoesthesia improved on a daily basis during her hospital stay. (*Id.*) Plaintiff was to continue doing home exercises and to begin physical therapy if she did not improve. (*Id.*) Dr. Peric-Stepcic noted that Plaintiff was unable to work due to her symptoms. (*Id.*)

Dr. Peric-Stepcic reported on October 7, 2008 that that the etiology of Plaintiff's peripheral neuropathy was unclear, but that she had been "improving a lot" since her initial presentation at the hospital. (*Id.* at 243) Plaintiff had started physical therapy the prior week. (*Id.*) Dr. Peric-Stepcic noted that Plaintiff regained all of her reflexes except at the ankle regions and that she was stronger with an improved sensory examination. (*Id.*)

In an October 14, 2008 letter, Dr. Karnish stated that he "evaluated Jo Ann yesterday for her work capacity based upon her recent diagnosis of Guillain-Barré syndrome. She appears to be recovering adequately at this time." (*Id.* at 231) Dr. Karnish noted that Plaintiff could begin part-time work (a maximum of 8 hour shifts with a maximum of thirty-six hours per week) effective

---

to Plaintiff's recent hospital stay at Atlantic General Hospital. The ALJ determined that Plaintiff was seen by Dr. Peric-Stepcic on September 30, 2008 for follow-up after her discharge from the hospital. Dr. Peric-Stepcic also saw Plaintiff on October 8, 2008. Dr. Peric-Stepcic provided his findings to Dr. Karnish on both occasions.

October 17, 2008. (*Id.*) On October 16, 2008, Dr. Karnish noted that Plaintiff had "acute peripherally neuropathy . . . possibly Guillain-Barré syndrome." (*Id.* at 230) Dr. Karnish expected Plaintiff to return to unrestricted work on November 3, 2008 if all went well. (*Id.* at 231) On October 21, 2008, Dr. Karnish noted that Plaintiff continued to have difficulty with rote memorization. (*Id.* at 229)

Plaintiff presented to Dr. Karnish on November 5, 2008 to discuss her fear of recurrent descending paralysis symptoms. (*Id.* at 255) She described recurrent pain and numbness in her feet having occurred on November 2, with eventual weakness and numbness of her thighs, and a stumbling gait. (*Id.*) Plaintiff reported that, since November 2, there had been no further progression of her symptoms. (*Id.*) Upon examination, Dr. Karnish found that Plaintiff's knee and hip flexors were 4 to 4+/5 upon strength testing. (*Id.*) He prescribed Lexapro for depression/anxiety. (*Id.*) Plaintiff saw Dr. Karnish on January 15, 2009 to address right hip pain. (*Id.* at 254) The pain was treated with oxycodone. (*Id.* at 254, 255)

Plaintiff presented to Dr. Karnish on April 9, 2009 with severe leg pain, which Dr. Karnish stated could be a residual effect of Guillain-Barré syndrome. (*Id.* at 251) He "[a]dvised [patient] today I have limited experience w/Guillain-Barré syndrome and cannot specifically state which [symptoms] are related to this disease process." (*Id.*) Dr. Karnish noted Plaintiff's chronic back and leg pain were interfering with her qualify of life and that the pain was uncontrolled by MSIR (i.e., morphine). (*Id.*) Dr. Karnish discussed various types of medication therapy. He suspected "depression may also be in play." (*Id.*)

When Plaintiff saw Dr. Karnish on May 12, 2009, she reported that her knees gave out and that she had fallen for a fourth time. (*Id.* at 252) That morning, her son had to drag her to their vehicle but, by the time of her office visit, Plaintiff was able to ambulate with more independence.

5

(*Id.*) As her paresthesia began to recede, Plaintiff noted improving strength, but she did not return to baseline. (*Id.*) Dr. Karnish noted, "there appears to be some type of neurologic process but I am not able to define it." (*Id.*) On May 18, 2009, Plaintiff complained to Dr. Karnish of worsening pains in her knees and more stiffness. (*Id.* at 250) Plaintiff advised Dr. Karnish that she had helped her son move during the past weekend and this required carrying heavy objects and increased ambulatory time. (*Id.*) During a July 31, 2009 appointment with Dr. Karnish, Plaintiff complained of worsening restless legs and an inability to afford her medication. (*Id.* at 249) She complained of chronic persistent pain, and Dr. Karnish renewed a prescription for morphine. (*Id.*)

On August 25, 2009, Plaintiff advised Dr. Karnish of a recent argument with her daughter that resulted in an exchange of blows. (*Id.* at 248) She denied worsened paresthesia and weakness of her legs following a blow to her head. (*Id.*) Plaintiff relayed that the altercation aggravated her depression and, as a result, Dr. Karnish increased her dose of Lexapro. (*Id.*) When Plaintiff was seen on October 13, 2009 for pain management, she complained that the pain seemed to emanate from her hip, although she also had diffuse myalgia. (*Id.* at 247)

On September 7, 2010, Plaintiff saw Dr. Karnish for a new type of lower back and left leg radicular pain. (*Id.* at 308) Plaintiff had difficulty bearing weight on her leg, and "has been using a borrowed quad cane for assistance w/ambulation." (*Id.*) Plaintiff denied an increase in paresthesia from the baseline. (*Id.*) Her strength was limited by pain, but was 4/5 in the ankle plantar flexors, knee extensors, and hip extensors. (*Id.*) Dr. Karnish increased the prescribed morphine and Lyrica prescription with a plan to taper the medication after the pain was controlled. (*Id.*)

Plaintiff was examined by State agency consultant Dr. Balepur Venkataramana ("Dr. Venkataramana") on September 24, 2010. (*Id.* at 278) Plaintiff provided a history of weakness in both legs and difficulty walking, severe foot pain, without support she tends to fall, changed

6

dexterity in her fingers, and an inability to complete household chores. (*Id.*) Plaintiff was unsteady and used a quad cane. (*Id.* at 279) Because she was unable to get on the examination table, she was examined while sitting in a chair. (*Id.* at 280) Upon examination, Dr. Venkataramana noted no muscle atrophy or muscle spasm, but that Plaintiff had limited neck and hip movement mainly due to weakness. (*Id.*)

Medical consultant Anne Aldridge ("Aldridge") completed a physical residual functional capacity assessment of Plaintiff on October 4, 2010. (*Id.* at 285) Aldridge determined that Plaintiff could: occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk about two hours in an eight hour day; and sit for six hours in an eight hour day. (*Id.* at 286) The assessment noted that the magnitude of Plaintiff's alleged symptoms were disproportionate to the objective evidence, citing the following examples: (1) Plaintiff's quad strength was decreased only to 4/5 and her other muscle groups were 5/5 without evidence of atrophy; and (2) the suspicion of "Lou Gehrig's disease" was inconsistent with the medical records which did not include such a diagnosis. (*Id.* at 289) Aldridge concluded that, because Plaintiff was a career nurse and would know the difference between the conditions, she was intentionally misrepresenting her diagnosis. (*Id.*)

On October 5, 2010, Pedro Ferreira, Ph.D. ("Dr. Ferreira") completed a psychiatric review of Plaintiff. (*Id.* at 291) Dr. Ferreira noted that Plaintiff had a prescription for Lexapro and Klonopin from her primary care physician to manage depression and help with anxiety and that she reported responding favorably to these medications. (*Id.* at 301) Dr. Ferreira found that Plaintiff had mild restrictions of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation. (*Id.* at 299) He concluded that Plaintiff's

mental health condition was non-severe. (*Id.* at 301) On March 14, 2011, Carlene Tucker-Okine, Ph.D. ("Dr. Tucker-Okine") affirmed Dr. Ferreira's October 5, 2010 psychiatric review. (*Id.* at 320)

When Plaintiff presented to Dr. Karnish on October 7, 2010, she stated that, due to pain, it sometimes takes her three hours to get out of bed and dressed. (*Id.* at 307) Upon examination, Dr. Karnish noted that Plaintiff's strength was limited secondary to pain, with 4/5 strength in the ankle plantar flexors, knee extensors, and hip extensors. (*Id.*) Plaintiff relayed that, due to pain in her neck, she felt she had to be "extra vigilant while driving." (*Id.*) Pain management included taking three to four 30 mg. morphine tablets around the clock, as well as Lexapro and Klonopin. (*Id.*) Plaintiff indicated that the cost of medication was becoming prohibitive. (*Id.*)

Dr. Karnish's December 4, 2010 letter/opinion lists Plaintiff's conditions as Legg-Calve-Perthes disease[6] of the left hip, episodes of immune thrombocytopenic purpura, complications from gastric bypass surgery, symptoms consistent with Guillain-Barré syndrome, and a cryptic, severe, and transiently acute fluid retention/edema process that remains undiagnosed. (*Id.* at 303) Dr. Karnish noted that Plaintiff had acute peripheral neuropathy during her fall 2008 hospitalization, that she was able to ambulate short distances upon her release from the hospital, but had relapsed weakness in the lower extremities resulting in transient falls. (*Id.*) He noted that Plaintiff required significant doses of narcotic analgesics to manage her lower extremity discomforts. (*Id.*) Dr. Karnish stated that "it is true that Jo Ann can move about and use her arms, hands and legs. However, the durations for which she can use her extremities varies according to the degree of discomfort present that day. When her pain is severe, she does have weakness particularly in her legs, and paresthesia

---

[6] Inflammation of the upper end of the femur. *The American Heritage Stedman's Medical Dictionary* 583 (2d ed. 2004).

8

tend to be present more than they are absent." (*Id.*) Dr. Karnish also referred to Plaintiff's muscle spasms and her treatment for depression. (*Id.* at 303-04) Dr. Karnish opined that Plaintiff would be unable to perform at least an eight hour work day, commensurate with any job as a medical professional nurse. (*Id.*)

Plaintiff presented to Dr. Karnish on March 22, 2011 with new left arm and leg discomforts. (*Id.* at 323) Plaintiff relayed that she had fallen and was stumbling due to leg weakness and that she was using a cane for stability. (*Id.*) Upon examination, her knee flexion was 4/5 on the left and 4+/5 on the right, with hip flexion 4/5 on the left and 4+/5 on the right. (*Id.*) Dr. Karnish discontinued Klonopin and prescribed Xanax. (*Id.*) On May 9, 2011, Plaintiff complained of worsening depression with an inability to fall asleep. (*Id.* at 322) She also complained of worsening pain in her extremities, as well as muscle spasms. (*Id.*) Dr. Karnish treated Plaintiff's mental health condition by continuing Lexapro, renewing Xanax, and adding Abilify. (*Id.*) In addition, the morphine prescription was renewed. (*Id.*) Dr. Karnish assessed Plaintiff as having chronic persistent somatic pain due to Guillain-Barré syndrome, fibromyalgia, and recurrent anasarca[7] of unclear etiology. (*Id.*)

On July 7, 2011, Dr. Karnish completed a physical residual functional capacity questionnaire for Plaintiff. Diagnoses included Guillain-Barré syndrome, amyotrophic lateral sclerosis, thrombocytopenic purpura, Legg-Calve-Perthes disease, nonspecific peripheral neuropathy, major depression, fibromyalgia, fluid retention, iron deficiency anemia, morbid obesity post gastric bypass, syncope, hypotension, and chronic persistent insomnia. (*Id.* at 327) Dr. Karnish referred to

---

[7] An accumulation of serious fluid in various tissues and cavities of the body. *The American Heritage Stedman's Medical Dictionary* at 41.

Plaintiff's complaints of constant and severe pain in the lumbar areas and bilateral upper and lower extremities that intensified with activity and her immobility of greater than 20 to 30 minutes. (*Id.*) Dr. Karnish indicated that Plaintiff suffered from depression and anxiety and was incapable of even low stress jobs. (*Id.* at 328)

Dr. Karnish determined that Plaintiff could sit for 20 to 30 minutes at a time, stand for 15 to 20 minutes at a time, and sit or stand/walk for less than two hours in an eight hour day. (*Id.* at 329) He indicated that Plaintiff needs to take unscheduled breaks and requires a job that permits shifting of positions at will. (*Id.*) Dr. Karnish noted that Plaintiff currently uses a cane or walker. (*Id.*) She could lift and carry less than ten pounds rarely and could never lift and carry ten pounds or more. (*Id.*) Plaintiff could not twist, stoop, crouch/squat, or climb ladders, and could rarely climb stairs. (*Id.* at 330) Dr. Karnish noted that Plaintiff had good days and bad days and would likely be absent from work more than four days per month. (*Id.*)

Plaintiff's list of medications as of July 8, 2011, included: MSIR for pain, Alprazolam for muscle spasms, Savella for fibromyalgia, Lyrica for depression and pain, Abilify for depression, Bumetanide and Spironolactone for dependent edema, Gabapentin for pain and muscle spasms, Albuterol and Advair for wheezing, Veramyst for nasal congestion, and magnesium and potassium supplements. (*Id.* at 162)

## C. The Administrative Hearing

An administrative hearing took place on July 11, 2011, before the ALJ, with testimony from Plaintiff, who was represented by counsel, and vocational expert Adina Platt Leviton ("VE"). (*Id.* at 35)

### 1. Plaintiff's Testimony

Plaintiff is 5'7" tall and weighs 200 hundred pounds, with a body mass index of

approximately 24. (*Id.* at 38, 44) She was 48 ½ years old at the time of the hearing. (*Id.*) Plaintiff was employed as a nurse until she became unable to work following a neurological event in September 2008, which, according to Plaintiff, was initially diagnosed as Lou Gehrig's disease, but later diagnosed as Guillain-Barré syndrome. (*Id.* at 39-43) She also has Legg-Calve-Perthes disease of the left hip, fibromyalgia, and a blood disorder. (*Id.* at 43-45)

Plaintiff testified that, due to lack of insurance, the only doctor she can afford to see is her primary care physician, Dr. Karnish. (*Id.* at 51) In addition, she cannot afford to see a neurologist, although at the time of the hearing she had an August referral for an ALS clinic in Maryland. (*Id.*) Plaintiff is not treated by a psychologist or psychiatrist, but receives antidepressants from Dr. Karnish. (*Id.* at 53)

Plaintiff testified that she has terrible difficulty with memory and problems retaining information. (*Id.* at 47, 58) She attempted to work as a receptionist and emergency medical technician, but only lasted three or four weeks because she was unable to handle the activity of the office. (*Id.* at 40) She needs help with dressing and bathing, and cannot clean her home. (*Id.* at 46) She acquired a walker about six weeks prior to the hearing because she is not steady on her feet. (*Id.* at 48) She watches television and is able to prepare a light meal if the ingredients are placed next to her. (*Id.* at 47) Plaintiff's family visits briefly or she visits them, although not as often as before. (*Id.* at 48-49) Plaintiff also testified that her depression causes her to go weeks without leaving the house. (*Id.* at 50) Plaintiff has a driver's license, but drives "very rarely." (*Id.* at 46)

Plaintiff has difficulty sleeping, does so at most three to four hours per night, and can go several nights without sleep. (*Id.* at 57) The lack of sleep is caused by pain and muscle spasms from the lower legs to the mid-back. (*Id.*) Plaintiff testified that her pain level is eight, with ten being the worst. (*Id.* at 58) She can sit ten minutes before switching positions and can barely walk from the

11

handicapped parking spot to the scooter at Wal-Mart. (*Id.* at 59) Plaintiff testified that there has been a gradual worsening of not being able to do anything as far as having the physical strength to do it. (*Id.* at 54)

Plaintiff takes a number of medications for her conditions and testified that they help "to some extent." (*Id.* at 50) The medications can cause "a complete drain of energy" and make Plaintiff feel like she is "in another zone" or "goofy." (*Id.*)

### 2. Vocational Expert's Testimony

The VE testified that there were no transferrable skills for Plaintiff limited to light or sedentary jobs. (*Id.* at 61) The ALJ posed hypothetical questions concerning a hypothetical person who was 48 years old with a high school and college education; had been a registered nurse; could read, write, and use numbers; was capable of understanding, remembering, and carrying out detailed instructions; with restrictions of standing and walking in excess of two but less than six hours; sitting for six hours in a given workday or with a sit/stand option; no balancing, stooping, or stairs; occasional crouching, crawling, squatting, and kneeling; and avoid concentrated exposure to heat and cold and hazards. (*Id.* at 61-62) The VE opined that the hypothetical individual could not perform the prior work or a full light job, but that there were other jobs in the local and national economy at a limited light semi-skilled level, light unskilled level, light semi-skilled, sedentary semi-skilled level, and sedentary unskilled level, including work such as a hostess/receptionist, companion, personal attendant, office helper, pre-assembler for printed circuit boards, assembler II for small products, hospital admitting clerk, appointment clerk, receptionist, addresser, order clerk for food and beverage, and taper for printed circuit boards. (*Id.* at 62-65)

When the ALJ added to the hypothetical the assignment of full credibility of every claim of pain from any source, the VE opined that with these additional limitations there would be no work

on a full-time sustained basis for such a hypothetical individual, due to the loss of productivity. (*Id.* at 66-67)

## D. The ALJ's Findings

The ALJ concluded that Plaintiff's medical conditions were not disabling. In reaching this conclusion, the ALJ first considered the nature and severity of Plaintiff's physical and mental impairments. (*Id.* at 22-24) The ALJ determined that Plaintiff's disorder of the nervous system, possible Guillain-Barré syndrome, fibromyalgia, and obesity were severe impairments, but that her mental impairment was mild. (*Id.* at 22, 24) The ALJ found that although Plaintiff's impairments were subjectively severe, there was insufficient evidence of record to meet the requirements of a listing in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ determined that Plaintiff could not perform her past relevant work. (*Id.* at 28) The ALJ determined that Plaintiff retained the residual functional capacity to perform light work,[8] except that she is capable of lifting twenty pounds occasionally and ten pounds frequently; she can stand and walk in excess of two hours but less than six; she can sit for six hours in any given day; she should not be required to balance on the job; she can only occasionally crouch, crawl, squat, and kneel, but should avoid stairs; her hazards should be restricted; and she should avoid concentrated exposure to heat or cold. (*Id.* at 24) The ALJ concluded that Plaintiff was capable of performing work that exists in significant numbers in the

---

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If some can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

national economy and, therefore, determined that Plaintiff was not disabled from November 6, 2008 through the date of the July 21, 2011 decision. (*Id.* at 30)

## III.  LEGAL STANDARDS

### A.  Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be -- or, alternatively, is -- genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or

14

suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However,

the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment;" a factual dispute is genuine only where "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations

omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment

is mandated "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial").

## B.     Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d

Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a

mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United

States Supreme Court has noted, substantial evidence "does not mean a large or significant amount

of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the

Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh

the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence

that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001).

However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or

the District Court as a basis for remanding the matter to the Commissioner for further proceedings,

pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility

determinations are the province of the ALJ and only should be disturbed on review if not supported

by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal

quotation marks omitted).

The Third Circuit has explained that: "a single piece of evidence will not satisfy the

substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence--

particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really

constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination but, rather,

whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d

Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give

deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial

evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from a physical

or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). For the purposes of DIB, a

"disability" is defined as the inability to do any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C.

16

§ 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003). In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of nondisability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A

claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

## B. The Issues Raised on Appeal

Matthias presents four issues in her appeal and moves for summary judgment on the grounds that the ALJ erred: (1) in relying upon the independent medical evaluation performed by Dr. Venkataramana rather than reports and records of Dr. Karnish, her primary care physician, or a neurologist who saw her on two occasions;[9] (2) in finding her testimony and information inconsistent and unreliable; (3) in relying upon the opinions of the vocational expert given that few

---

[9] Plaintiff names the neurologist as Dr. Moore. However, the record reflects that Plaintiff was seen twice by Dr. Peric-Stepcic. (Tr. at 235-43) Neurologist Dr. James Moore authored a September 27, 2011 letter (*id.* at 332) following the ALJ's decision, as discussed in Section IV.B.5. *infra*.

positions exist in the local economy and she is unable to perform jobs at the sedentary semi-skilled or sedentary unskilled levels; and (4) in the assessment of her residual functional capacity.

The Commissioner moves for summary judgment on the grounds that: (1) substantial evidence supports the weight given to, and the assessment of, the opinions of Plaintiff's treating physician, Dr. Karnish; (2) the VE's discussion of jobs available in significant numbers in the national economy was appropriate; (3) Plaintiff's post-hearing evidence – which consists of records dated after the ALJ's decision -- may not be considered as substantial evidence in the review of the ALJ's decision and do not warrant a sentence six remand pursuant to 42 U.S.C. § 405(g); and (4) Plaintiff's severity and credibility arguments should be rejected.

The Court considers each of these issues in turn.

### 1. Medical Opinions

Plaintiff argues that the ALJ gave insufficient deference to the opinions of treating physician Dr. Karnish and a neurologist who saw her on two occasions. The Commissioner responds that the ALJ properly afforded little weight to the opinions of Dr. Karnish in light of the other evidence of record, that the record lacks objective medical testing and evidence to substantiate Plaintiff's alleged symptoms and complaints of pain, that his opinions are often in conflict with other portions of the record, and that the records of Dr. Karnish, who is a doctor of osteopathic medicine, reveal his limited knowledge of Plaintiff's specific neurological disorder. (Tr. at 27, 28, 230, 245, 251)

An ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence he rejects. *See Diaz v. Commissioner of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer*, 186 F.3d at 429 ("An ALJ . . . may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). Opinions of a treating physician are entitled to controlling weight only

19

when they are well-supported and not inconsistent with other substantial evidence in the record. *See Hall v. Commissioner of Soc. Sec.*, 218 F. App'x 212, 215 (3d Cir. Feb. 22, 2007) (affirming ALJ's decision to give little weight to treating physician's reports because of "internal inconsistencies in various reports and treatment notes . . . as well as other contradictory medical evidence"); *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).

In the opinion, the ALJ detailed her reasons for affording less weight to the opinions of Dr. Karnish, citing the medical evidence of record.[10] The ALJ noted that there was no definitive diagnosis of Guillain-Barré syndrome, although the record does reflect that Plaintiff was diagnosed with acute peripheral neuropathy. In addition, the ALJ noted that Dr. Karnish's treatment records are based upon Plaintiff's subjective complaints of pain and weakness without substantiation by any form of objective medical testing to confirm Plaintiff's symptoms or the diagnosis of a neurological disorder. Dr. Karnish opined that Plaintiff was limited in the use of her extremities; however, his opinion was based upon Plaintiff's subjective complaints and was not substantiated by medical testing. (Tr. at 303) In addition, Dr. Karnish's opinion, with regard to Plaintiff's ability to stand, sit, walk, and lift, did not appear to consider strength testing of Plaintiff between 4/5 and 4+/5, or that Plaintiff had been able to help her son move, which involved standing and lifting, or that Plaintiff had been involved in a physical altercation with her daughter. (*Id.* at 248, 250, 255, 259, 307, 323) The ALJ further noted that Dr. Karnish is a family practitioner with no apparent specialty in neurology or orthopedic medicine and, as he admitted in his notes, he has limited experience with Guillain-Barré syndrome and could not specifically state which symptoms are related to the disease

---

[10] Plaintiff seems to argue that the ALJ did not consider the records of her neurologist. The ALJ's decision specifically references and considers the records of Dr. Peric-Stepcic, while making no assignment of weight. (Tr. at 25, 27)

20

process. (*Id.* at 239) Finally, State agency physician Dr. Venkataramana noted no muscle atrophy or muscle spasm but limited neck and hip movement mainly due to weakness, while State agency medical consultant Aldridge concluded that Plaintiff retained the physical capacity to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk about two hours in an eight hour day; and sit for six hours in an eight hour day; occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk about two hours in an eight hour day; and sit for six hours in an eight hour day.

After a careful review of the evidence of record and considering Plaintiff's and Defendant's positions, the Court finds that the ALJ did not err in the assignment of weight to the opinions of Dr. Karnish.

## 2. Credibility of Plaintiff and Severity of Conditions

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment. Matthias argues that the ALJ did not give sufficient weight to her testimony and that the inconsistencies as interpreted by the ALJ are due to the severity of Plaintiff's depression. The Commissioner responds that, based upon the record, the ALJ correctly found that Plaintiff's depression was non-severe and did not support a finding that Plaintiff's physical conditions were severe, other than those identified as severe by the ALJ. (*See* Tr. at 22)

With regard to Plaintiff's credibility, an ALJ must give great weight to a claimant's testimony "when this testimony is supported by competent medical evidence," and an ALJ may "reject such claims if he does not find them credible." *Schaudeck v. Commissioner of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999). The ALJ "has the right, as the fact finder, to reject partially, or even entirely, such

21

subjective complaints if they are not fully credible." *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974).

Under 20 C.F.R. § 404.1529(c)(3), the kinds of evidence that the ALJ must consider, in addition to the objective medical evidence, when assessing the credibility of an individual's statements include: the individual's daily activity; location, duration, frequency, and intensity of the individual's symptoms; factors precipitating and aggravating the symptoms; the type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; treatment, other than medication, received for relief of the symptoms; any non-treatment measures the individual uses to relieve pain or symptoms; and other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3). In addition, the ALJ should account for the claimant's statements, appearance, and demeanor; medical signs and laboratory findings; and physicians' opinions regarding the credibility and severity of plaintiff's subjective complaints. Social Security Ruling 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996). The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling 96-7p, 1996 WL 374186, at *3; *see also Schaudeck*, 181 F.3d at 433.

The ALJ discussed in detail her reasons for finding Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her impairments "not credible," as her reports of pain and weakness are not consistent with the medical record as a whole. The ALJ noted that Plaintiff's impairments could reasonably cause some symptomatology. However, the ALJ considered the numerous inconsistencies between Plaintiff's testimony and the evidence of record, her reported

22

daily activities, the medical findings of the treating physicians and consultative examiner, as well as the opinion of the medical consultant, to find that Plaintiff's subjective complaints about her limitations not fully persuasive.

As the ALJ correctly notes, there is no evidence of a definitive diagnosis of Guillain-Barré syndrome, no evidence that testing occurred other than during Plaintiff's single hospitalization, no evidence of objective testing, the consultative physician found no muscle atrophy or muscle spasm, and while Plaintiff uses an assistive device, the device was not prescribed by her physician. Finally, Plaintiff did not follow-up with a neurologist even though she testified that the pain and weakness is worsening.

With regard to the ALJ's finding that Plaintiff's depression does not cause more than minimal limitation, the ALJ properly relied upon the record. The record reflects that Plaintiff's only treatment for depression was from Dr. Karnish, who prescribed anti-depressants. Plaintiff did not receive treatment from a psychologist or a psychiatrist. Finally, the ALJ's findings are consistent with the psychiatric review technique of Dr. Ferreira, affirmed by Dr. Tucker-Okine.

For the above reasons, the Court finds that ALJ did not err with regard to the severity of Plaintiff's conditions or in finding Plaintiff's statements concerning the intensity, persistence, and limits effects of the symptoms are not credible to the extent they are inconsistent with the RFC.

### 3. VE's Opinion

The VE testified that there were jobs in the local and national economy that Plaintiff could perform. Plaintiff argues that many of the jobs cited by the VE exist nationally but few, if any, are available locally. The Commissioner argues that the VE's testimony with respect to jobs available in the national economy was appropriate.

23

The regulations permit the use of "job information available from various governmental and other publications," including for example the Dictionary of Occupational Titles, published by the Department of Labor. *See* 20 C.F.R. § 404.1566(d); Social Security Ruling 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000). Contrary to Plaintiff's contention, "[i]t does not matter whether (1) work exists in the immediate area in which you live; (2) a specific job vacancy exists for you; or (3) you would be hired if you applied for work." 20 C.F.R. § 404.1566(a); *see also Wafford v. Commissioner of Soc. Sec.*, 2010 WL 5421303, at *5 (S.D. Ohio Aug. 19, 2010) ("There is no requirement that there are potential jobs available in the immediate area where plaintiff lives, as long as there are jobs available nationally and are not all concentrated in one region.") (citing *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999)); *Dickerson v. Colvin*, 2014 WL 562981, at *10 (D.N.J. Feb. 11, 2014). Thus, the Court finds no merit to this argument.

### 4. Residual Functional Capacity

The Court concludes that there is substantial evidence to support the ALJ's assessment of Plaintiff's RFC. The record demonstrates that Plaintiff does not have the ability to perform all or substantially all of the requirements of the full range of light work. Therefore, the ALJ accommodated Plaintiff's additional limitations (*e.g.*, a sit-stand option (Tr. at 63-65)) and, with the assistance of the VE, found that even with the additional limitations Plaintiff remained qualified to perform several types of jobs present in the economy (*id.* at 29). It has been recognized that "[i]n situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere 'in the middle' in terms of the regulatory criteria for exertional ranges of work . . . VS [vocational specialist] assistance is advisable." Social Security Ruling 83-12, 1983 WL 31253, at *3 (1983); *see also Santiago v. Barnhart*, 367 F. Supp. 2d 728, 733 (E.D. Pa. 2005) ("There is nothing oxymoronic in finding that a plaintiff can perform a limited range of light work."). Thus,

the ALJ had a sufficient basis to find that Plaintiff could perform a limited range of light work, which also includes sedentary work.

There is substantial evidence to support the ALJ's classification of Plaintiff as being limited to light work with the additional sitting/standing restriction, which includes the findings of the consulting physicians. In addition, and contrary to Plaintiff's assertion, the ALJ weighed the evidence about her need for a cane. She addressed the lack of objective evidence from treating physicians showing that Matthias medically required a cane, distinguishing such evidence from the multiple observations in the record that Matthias used a cane. There is substantial evidence to support the ALJ's finding that Plaintiff did not have a medical necessity for a cane. Hence, the ALJ's decision not to incorporate the limitation of a cane into Plaintiff's RFC determination was not unreasonable. Finally, with regard to Plaintiff's depression, the ALJ reviewed the record and observed Matthias' lack of formal mental health treatment, with her only therapy being regular prescription medication provided by her primary care physician. Thus, again, the Court finds substantial evidence supports the ALJ's assessment of Plaintiff's RFC.

### 5.    Post-Hearing Evidence

Plaintiff submitted additional evidence to the Appeals Council, following the ALJ's July 21, 2011 decision. The Commissioner contends that this evidence may not be considered by the Court in the instant appeal. The records include a September 27, 2011 letter from neurologist Dr. James Morgan, a May 11, 2012 letter from Dr. Karnish, and records for Peninsula Orthopaedic Associates from November 2011 to October 2012. (Tr. at 335-87)

When a claimant submits evidence after the ALJ's decision, that evidence cannot be used to challenge the ALJ's decision on the basis of substantial evidence. *See Matthews*, 239 F.3d at 594. Pursuant to 42 U.S.C. § 405(g), sentence six, the Court may, however, order a remand based upon

25

evidence submitted after the ALJ's decision, but only if the evidence satisfies three prongs: (1) the evidence is new; (2) the evidence is material; and (3) there was good cause why it was not previously presented to the ALJ. *See Matthews*, 239 F.3d at 593.

Plaintiff does not meet these requirements. All of the evidence post-dates the ALJ's July 21, 2011 and relates to a period after the ALJ's decision. In addition, some of the records submitted relate to a hip replacement and knee problems occurring between November 2011 and October 2012. "[A]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984); *see also Nieves v. Commissioner of Soc. Sec.*, 198 F. App'x 256, 260 n.3 (3d Cir. Oct. 4, 2006) ("Our determination [that the ALJ's decision in 2001 was based on substantial evidence] is in no way swayed by the fact that in October of 2003 an ALJ determined that the petitioner was disabled. As per 42 U.S.C. § 405(g), [the court's] review is limited to the evidence in the record at the time of the 2001 decision of the ALJ and [it is] therefore not required, nor able, to consider this subsequent ALJ ruling when rendering [its] decision.").

The records at issue post-date the ALJ's decision and/or relate to later acquired issues and, therefore, are not considered. The Court finds no basis to remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).[11]

---

[11] Plaintiff has available the option of filing a new application, should she believe the new evidence supports an award of DIB benefits. *See* 20 C.F.R. § 416.330(b).

## V.   CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's motion for summary judgment and will grant Defendant's motion for summary judgment.

An appropriate Order will be entered.